UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SAFEWORKS, LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>SPYDERCRANE.COM, LLC, an Arizona corporation,<br><br>Defendant. | Case No. 08-cv-0922-JPD<br><br>MEMORANDUM OPINION |

## I.  INTRODUCTION

Plaintiff SafeWorks, LLC ("SafeWorks") brought claims against defendant Spydercrane.com, LLC ("Spydercrane") for trademark infringement and unfair competition under sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and for alleged violations of Washington's Unfair Business Practices and Consumer Protection Act, R.C.W. § 19.86 *et seq.*  SafeWorks alleges that Spydercrane has and continues to infringe SafeWorks' rights in its registered SPIDER marks by Spydercrane's use of its SPYDERCRANE mark. This matter was tried to the Court on October 27-29, 2009. This memorandum opinion will constitute the Court's findings of fact and conclusions of law.

MEMORANDUM OPINION
PAGE - 1

## II. JURISDICTION

Pursuant to 28 U.S.C. § 636(c), the parties have consented to having this matter heard by the undersigned United States Magistrate Judge. Dkt. No. 13. The Court has personal jurisdiction over Spydercrane because Spydercrane has personally availed itself of the forum of Washington State through its mix of sales to Washington residents and Internet contacts. Dkt. No. 30. Spydercrane's sales to Washington residents was confirmed at trial. Exh. 57. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## III. BACKGROUND

### A. SafeWorks and its SPIDER Marks

SafeWorks is based in Tukwila, Washington, and it is the owner of several registered SPIDER marks, including U.S. Trademark Registration Nos. 696,387 (SPIDER); 2,406,766 (SPIDER with hanging spider design element); 2,438,034 (SPIDER-LINE); 557,536 (SPIDER STAGING); 1,239,947 (SPIDER); 1,385,728 (Spider work basket design); and 696,385 (hanging spider design); and 1,398,243 (Spider work basket design), covering hoisting and suspended staging and scaffolding equipment. Exhs. 1-8. SafeWorks' Spider brand and division has manufactured, sold and rented lifting, hoisting, safety and suspended access equipment under the SPIDER marks since 1947. SafeWorks' predecessor first registered a SPIDER mark in 1960. Spider's lifting, hoisting and suspended access equipment is used to lift and lower people and materials both above and below ground. For example, Spider's equipment is used to lift and lower people and materials along the vertical surface of a building, and to suspend the people and materials at a particular height above ground. Spider's equipment is used in the construction, mining and maintenance industries.

As Elizabeth Callahan, Vice President of Marketing at SafeWorks, testified, Spider sells and rents lifting and hoisting equipment in all 50 states. Spider has roughly 3,000

customers and about 750 different products, 20 of which the company considers to be cranes. The annual revenue of the Spider division is about $50 million, and about half of that comes from rentals. A typical monthly rental for a SPIDER-branded product is $1,300, and the rental cost is generally a small percentage of the overall cost of the construction project on which the Spider equipment is used. According to Ms. Callahan, while most rental customers will request a particular product or products, about a third of the time the rental customer will only state their particular needs in terms of how high they need to lift and lower the load and the weight of the load. Spider will then recommend a particular lifting solution. Ms. Callahan estimated that about 75% of the time the Spider renter is a construction foreman or job superintendent.

### B. Spydercrane and its SPYDERCRANE Mark

Spydercrane is a crane distribution business based in Tempe, Arizona. Spydercrane sells truck-mounted cranes with stabilizing "out and down" outriggers and cranes on rubber tracks which also have four articulated legs (known in the industry as crawler or mini crawler cranes). According to Warren Wagoner, co-founder, co-owner and President of Spydercrane, the company sells about twenty-seven models of truck-mounted cranes and two models of crawler cranes. The cranes are manufactured by FURUKAWA UNIC Corporation of Japan. Most of the cranes sold by Spydercrane carry only the UNIC brand, but about 10% of the cranes sold carry the Spydercrane name instead.

Mr. Wagoner testified that the company was formed in early 1999 as Best Crane but the company changed its name to Spydercrane in the latter part of 1999. Mr. Wagoner did not perform a trademark search prior to selecting the Spydercrane name. The company sold its first crane under the Spydercrane name in late 1999. Since that time, Spydercrane has sold approximately 1,000 cranes in North America, roughly 100 of which, or 10%, are the crawler crane models. Accordingly, the large majority of Spydercrane's business involves sales of its

truck-mounted cranes. Spydercrane sells most of its cranes to crane dealers and rental businesses.

Spydercrane registered its primary Internet domain name, www.spydercrane.com, in 1999 and reregistered it in approximately 2001. Spydercrane has continuously owned the www.spydercrane.com domain name since about 2001. The company has since registered about thirty-one separate domain names, about two of which include the word "spider" as part of the domain name. If an individual types one of the company's various registered domain names in a browser, the individual will be directed to the www.spydercrane.com website.

### C. Procedural History

Spydercrane applied to register the SPYDERCRANE mark with the U.S. Patent and Trademark Office ("USPTO") in 2008. In mid-May 2008, upon learning of the trademark application, SafeWorks' counsel sent Spydercrane a cease and desist letter, demanding that Spydercrane end any further use of the terms "spyder," "spydercrane" or "spydercrane.com," including as its company name, and abandon any Internet domain names incorporating the terms "spyder" or "spydercrane." Subsequent discussions between the parties were not successful, and on June 12, 2008, SafeWorks filed the instant action for trademark infringement and unfair competition. Dkt. No. 1. SafeWorks' motion for summary judgment was denied, Dkt. No. 59, and this matter was tried as a bench trial on October 27-29, 2009.

## IV. DISCUSSION

### A. SafeWorks' Trademark Infringement Claim

To establish trademark infringement, a plaintiff must demonstrate that it has a valid mark, it is the senior mark, and the defendant's mark is likely to cause confusion in the marketplace. *See Brookfield Comms., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1046-47 (9th Cir. 1999). Plaintiff's trademark registration is prima facie evidence of the validity of its mark. 15 U.S.C. § 1057(b). There is no dispute that SafeWorks began using its SPIDER

marks prior to Spydercrane's adoption of its SPYDERCRANE mark. Therefore, the resolution of this case revolves around the issue of likelihood of confusion.

The "likelihood of confusion" requirement directly advances the dual purposes of infringement law: "ensuring that owners of trademarks can benefit from the goodwill associated with their marks and that consumers can distinguish among competing producers." *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002). The question of whether an alleged trademark infringer's use of a mark creates a likelihood of confusion among the consuming public is the "core element" of trademark infringement law. *Id.*

The Ninth Circuit has identified eight factors relevant to determining whether confusion is likely: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks and names; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). Whether there is a likelihood of confusion is ordinarily a question of fact to be resolved by the factfinder. *See Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 759 (9th Cir. 2006). The Ninth Circuit has advised that weighing the eight *Sleekcraft* factors is not like counting beans. Rather, the factors are intended to guide the courts in assessing the basic question of likelihood of confusion. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield*, 174 F.3d at 1054. The Court will analyze each of the eight *Sleekcraft* factors below.

        1.        Strength of the Mark

"Trademark law offers greater protection to marks that are 'strong,' i.e., distinctive." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992). "The strength of a mark is determined by its placement on a continuum of marks from 'generic,' afforded no

protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful,' awarded maximum protection." *Id.* (internal quotation marks omitted).

Generic marks are "those that refer to the genus of which the particular product is a species." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (internal quotation marks omitted). "Descriptive terms directly describe the quality or features of the product." *Brookfield*, 174 F.3d at 1058 n.19. "A suggestive mark conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Id.* Finally, "[a]rbitrary and fanciful marks have no intrinsic connection to the product with which the mark is used; the former consists of words commonly used in the English language . . . whereas the latter are wholly made-up terms." *Id.* (citation omitted).

Identifying whether a mark is generic, descriptive, suggestive, arbitrary or fanciful, however, is only the first step of the inquiry. The second step is to determine the strength of the mark in the marketplace, *i.e.*, the commercial strength of the mark. *One Industries, LLC v. Jim O'Neal Dist., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009). "When similar marks permeate the marketplace, the strength of the mark decreases. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." *Id.* (internal quotation marks omitted).

The Court previously held in its order denying SafeWorks' motion for summary judgment that the SPIDER marks fall into the suggestive category, as the marks require the exercise of some imagination to determine the nature of the products sold under the marks. The Court also found on summary judgment that the SPIDER marks are very strong with regard to lifting, hoisting, safety and suspended access equipment. However, the Court finds that the evidence at trial demonstrated that a separate and distinct market exists for the truck-mounted and crawler cranes sold by Spydercrane. As discussed more fully in the section below, SafeWorks' Spider division and Spydercrane sell distinctly different products to divergent classes of customers with different functional needs and uses. While both

MEMORANDUM OPINION
PAGE - 6

companies sell products that are used to lift things, the similarities largely end there, and the differences in the respective products far outweigh the similarities.

Tellingly, there was no evidence presented at trial that the SPIDER mark had any strength or awareness in the market for the truck-mounted and crawler cranes that are sold by Spydercrane (apart from the SPYDERCRANE mark). That is not surprising, given that the Spider division does not manufacture or sell truck-mounted or crawler cranes. That Spider does not compete in Spydercrane's market is also evidenced by the fact that it did not discover Spydercrane's use of the SPYDERCRANE mark until 2008, after Spydercrane used the mark for nine years, and only then because it was notified by the USPTO upon Spydercrane's attempt to register the SPYDERCRANE mark. The evidence at trial showed that there are relatively few players in the truck-mounted and crawler crane market in the United States. If the Spider division and Spydercrane indeed competed in the same market, SafeWorks would have learned of Spydercrane in short order.

In addition, it is worth noting the relative prevalence of "spider" and "spyder" in the commercial world. Indeed, a cursory trademark search on the USPTO's website reveals 838 dead and live records that contain "spider" or "spyder." *See* USPTO website, www.uspto.gov (last visited Dec. 1, 2009).[1] The relative pervasiveness of "spider" and "spyder" in commerce is relevant here because it highlights the importance of defining the appropriate market before determining the commercial strength of a mark. Just because a particular "spider" or "spyder" mark is commercially strong in one given market (as the SPIDER mark is in the lifting, hoisting, safety and suspended access market) does not mean that the mark is commercially strong in another, separate market within the broader commercial world. To be sure, the relative ubiquity of "spider" and "spyder" marks in the nation's diverse economy points toward a conclusion that it is possible for multiple "spider" and "spyder" marks to coexist in

---

[1] The Court may take judicial notice of the online records maintained by the USPTO. *See, e.g., Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1137 n.19 (C.D. Cal. 2007).

MEMORANDUM OPINION
PAGE - 7

separate and distinct markets. And given the frequency of "spider" and "spyder" in the marketplace, each user's ability to prevent use by others in other, separate markets is relatively weak, as compared with, for example, an arbitrary mark that is uncommon. That is the case here: the Spider division's lack of presence in the truck-mounted and crawler cranes market means that its ability to prevent Spydercrane's use of the SPYDERCRANE mark in that separate and distinct market is relatively weak, notwithstanding the SPIDER marks' strength in the hoisting and suspended access market. In sum, the "strength of the mark" factor weighs in favor of Spydercrane.

### 2. Proximity of the Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield*, 174 F.3d at 1055. "In other words, the closer the parties are in competitive proximity, the higher the likelihood of confusion." *Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1020 (N.D. Cal. 2009). The focus of the inquiry is not on the relatedness of each party's "prime directive," but rather on whether customers are likely somehow to associate Spydercrane's products with Spider. *See Brookfield*, 174 F.3d at 1056. Factors to consider in determining the degree of proximity of the goods include whether the goods are complimentary, whether the goods are sold to the same class of purchasers, and whether the goods are similar in use and function. *See Sleekcraft*, 599 F.2d at 350.

As mentioned above, while both parties sell products that are used to lift things, the similarities largely end at that broad vantage point. Spider's products are accurately and fairly described as hoists -- not cranes -- that are configured with other Spider products to lift and lower people and materials and suspend them at height. A classic example of an application of Spider's products is a suspended platform for window washing on the vertical surface of a tall building. While Spider's hoists may be attached to relatively short outriggers or beams, the hoists are generally fixed in place on the outrigger and the outrigger is usually part of a

temporary or permanent installation at the top of a building or some other elevated structure. The powered hoists are then used to lower, lift and suspend people and materials at height. That Spider sells hoists, and not cranes, is evidenced by the fact that its product catalog, including its glossary and product index, makes no mention of cranes; if Spider were trying to reach customers that wanted to purchase cranes -- truck-mounted cranes, crawler cranes or otherwise -- it follows that its 379-page product catalog would make mention of cranes. *See* Exh. 18. Similarly, there was no evidence at trial of Spider marketing or advertising materials describing cranes to potential customers.

On the other hand, Spydercrane sells truck-mounted and crawler cranes. The cranes are mobile and can drive into and out of different construction sites. They operate easily in three-dimensional space and are not generally limited to moving things up and down from an elevated, stationary position. Indeed, the crawler cranes can enter into and out of buildings and pass through doorways. Spydercrane's truck-mounted and crawler products are fairly described as cranes, as they are self-contained mobile units that have powered, telescopic booms that can rotate 360 degrees and have a hook attached at the end. Spydercrane's cranes are used to lift up materials or things from one location and place the materials or things down at another location; they are not used for suspended access. While Spydercrane's cranes may be aesthetically unique, they fit squarely within the traditional concept of a crane, while Spider's products do not.

In addition, Spider's products are very often used for lifting, lowering and suspending people, as opposed to materials and equipment. However, as Mr. Wagoner testified, Spydercrane does not recommend using its mobile cranes for lifting people for risk, liability, legal and efficiency reasons. UNIC, the manufacturer, also does not recommend using its cranes for lifting people. Spydercrane's cranes do not have controls at the end of the extendable booms for directing the movement of the crane, insulation to prevent electrical shock, and leveling technology, as would be required for personnel-lifting, nor does

Spydercrane sell its cranes with work baskets fixed at the end of the boom for holding people. While an end user may modify their Spydercrane to hold a person in a work basket, there was no evidence that Spydercrane has ever had any involvement with this. Tony Smiley, the owner of Smiley Lifting Solutions and a large dealer for Spydercrane, testified that he knows of only one end user in the United States and two end users in Canada that have attached a work basket at the end of a Spydercrane product. Mr. Smiley also testified that different industry and regulatory standards apply for lifting people. As such, Spydercrane's truck-mounted and crawler cranes are used virtually exclusively for lifting materials and things, as opposed to lifting, lowering and suspending people as with Spider's products.

The parties also sell their products to different classes of purchasers. While it is true that both parties sell their products to persons and businesses affiliated with the construction industry, that is far too broad a category of purchasers to be meaningful. As Ms. Callahan testified, the Spider division sells and rents its products primarily to end users such as contractors, job superintendents and forepersons. In contrast, Spydercrane sells its products primarily to crane dealers and business owners and other high-level decision-makers because of the significant investment involved in purchasing a truck-mounted or crawler crane. Spydercrane does not rent its products and therefore does not generally deal with job superintendents and forepersons. The purchase price of a crane from Spydercrane is, at a minimum, $50,000, and can reach $100,000 or higher. Consequently, the typical Spydercrane customer generally spends significant time making his or her purchase decision and may even travel to Arizona to inspect the product in person. As well, the sales cycle for a Spydercrane purchase can last months. However, as Ms. Callahan testified, Spider derives half its revenue from rentals. A typical monthly rental for Spider is only $1,300 and the rental can be arranged relatively expeditiously. Therefore, as opposed to with Spydercrane, the rental is generally handled by rank and file workers. Lastly, while Ms. Callahan testified that the parties have 20

customers in common, this number alone is insignificant given that it is less than 1% of Spider's approximately 3,000 customers.

In view of the differences in the use and function of the parties' respective products, as well as the differences in the classes of purchasers, this factor weighs against a finding of likelihood of confusion.

### 3. Similarity of the Marks and Names

Similarity of marks is "tested on three levels: sight, sound, and meaning," and "similarities weigh more heavily than differences." *Sleekcraft*, 599 F.2d at 351. The marks "must be considered in their entirety and as they appear in the marketplace." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).

The similarity of name between "SPIDER" and "SPYDERCRANE" is stronger than the similarity of the overall marks with their respective design elements and logo. However, the names must be considered in their entirety and as they appear in the marketplace, and the addition of "crane" to "Spyder" with no space in between does serve to distinguish what would otherwise be two very similar looking and sounding names. Moreover, while the two names both use Spider/Spyder, it is worth noting again that "Spider" and "Spyder" are relatively common as names or name elements in the commercial world. Nonetheless, given that there are some parallels between the parties' respective products in that they are both used to lift things, and they each use Spider/Spyder in their names, this factor weighs in favor of a finding of likelihood of confusion.

### 4. Evidence of Actual Confusion

Evidence that use of a mark or name has already caused actual confusion as to the source of a product is "persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. To constitute trademark infringement, there must be confusion as to an appreciable number of reasonably prudent people with respect to the source of a product. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002). However, actual

confusion is hard to prove, so the absence of such evidence is generally not noteworthy. *See Brookfield*, 174 F.3d at 1050.

In response to a Request for Admission, SafeWorks admitted it was unaware of any instances of actual confusion. Exh. 110, pg. 2. This conclusively establishes that SafeWorks had no evidence of actual confusion. FED. R. CIV. PRO. 36(b). However, after the Request for Admission was answered, SafeWorks became aware of an instance of some level of confusion in a telephone call to Al Contreras, a sales representative for Spider. There was no subsequent motion by SafeWorks to set aside or amend its earlier Request for Admission response. *See* FED. R. CIV. PRO. 36(b). However, there also was no objection to the trial testimony of Mr. Contreras on the basis of the prior Request for Admission, so the Court will address it below.

Mr. Contreras testified that he received a telephone call in August 2009 from a "Craig" at Monument Steel. Craig was calling to order parts for his Spydercrane crane -- not Spider parts. Craig indicated to Mr. Contreras that he obtained Spider's telephone number from Lisa, who, as Larry Boyd, the President and owner of Monument Steel, testified, was a new bookkeeper at Monument Steel. Apparently, Lisa gave Craig the wrong telephone number (*i.e.*, she gave him the number for Spider when he wanted the number for Spydercrane). This evidences a mistake on the part of a new employee and to that extent evidences some form of confusion. However, in light of Lisa's job and the circumstances of the call, it is not evidence of confusion on the part of a reasonably prudent consumer. That this is the only evidence of a degree of confusion by anyone over a ten-year period is particularly telling. In the final analysis, because actual confusion is hard to prove, this factor is neutral.

     5.     Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Here, Spydercrane and SafeWorks both utilize the Internet for marketing and sales efforts. However, this says little about having convergent marketing channels, as virtually all businesses that sell goods and services today have some sort of online presence.

*See Rearden*, 597 F. Supp. 2d at 1024. SafeWorks uses the Internet domain names www.safeworks.com and www.spiderstaging.com. Spydercrane principally uses the domain name www.spydercrane.com. No evidence was introduced at trial about Internet search engine results if searching simply for "spider" or "spyder."

With regard to print advertising, it appears that there is no overlap, as Roger Bassetti, co-founder, co-owner and Vice President of Marketing and Sales at Spydercrane, testified that Spydercrane advertises only in the Crane Hotline magazine and Ms. Callahan testified that the Spider division does not advertise in Crane Hotline. Spider advertises in more end user-focused publications. In addition, while both SafeWorks and Spydercrane both attend CONEXPO, a triennial international exposition for the construction industries, neither party was aware of the other party's presence at CONEXPO, which speaks both to the large size of CONEXPO (which weighs against a finding of convergence) and a lack of competitive proximity between the parties' respective products.

Lastly, Ms. Callahan testified as to SafeWorks' multi-million dollar marketing budget, which towers over Spydercrane's much smaller budget. In fact, Mr. Bassetti testified that Spydercrane really does not have a marketing budget. Spydercrane relies almost exclusively on its established dealer relationships and word of mouth to sell its products, and does not rely on a hefty marketing budget as with SafeWorks. Given the glaring differences in marketing budgets, it follows that the parties have divergent marketing channels. While SafeWorks also relies on established relationships and word of mouth, as do most businesses, there was no evidence at trial of any material overlap between the parties' respective relationships that they rely upon to sell their products. In sum, the Court finds that the parties' marketing channels are not convergent, and this factor weighs against a finding of likelihood of confusion.

      6.      Type of Goods and Degree of Care Exercised by Purchaser

Likelihood of confusion is determined from the standpoint of a "reasonably prudent consumer." *Brookfield*, 174 F.3d at 1060 (internal quotation marks omitted). "Expectations

MEMORANDUM OPINION
PAGE - 13

for the reasonably prudent consumer are largely based on his or her level of sophistication and the nature of the goods and services involved." *Rearden*, 597 F. Supp. 2d at 1025. For example, "[w]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases," and "[w]hen the buyer has expertise in the field, a higher standard is proper." *Sleekcraft*, 599 F.2d at 353.

As both parties' respective products are major purchases, Ms. Callahan acknowledged that customers are likely to exercise care before buying. *See also* Exh. 111, pg. 12. As mentioned above, the purchase price of a crane from Spydercrane is, at a minimum, $50,000, and can reach $100,000 or higher. Consequently, the typical Spydercrane customer generally spends significant time making his or her purchase decision and may even travel to Arizona to inspect the product in person. Indeed, Mr. Boyd of Monument Steel testified that he traveled to Spydercrane's place of business in Arizona to inspect the cranes in person before deciding to make his purchase. In addition, Mr. Smiley described the lengthy process involved before a customer purchases a Spydercrane crane. Load capacity, truck and chassis size, gross vehicle weight rating, axel rating, wheel base and operating radius are examples of factors that must be considered before a sale can be made. Some customers provide their own trucks and some need to purchase the truck along with the crane. Mr. Smiley also testified that he estimated a sale can take up to 120 days from initial inquiry to delivery. He also estimated that the price of a crane from Spydercrane can reach as much as $130,000. A purchaser will not enter into that size of a transaction without the exercise of care.

SafeWorks, however, also contends that there is a separate market -- the rental market -- in which substantially less care is taken. The rental business, which makes up 50% of Spider's annual revenue, generally deals with job superintendents and forepersons. In addition, monthly rentals only cost about $1,300. However, a problem with this argument is that Spydercrane is not in the rental business; it is comparing apples to oranges because Spydercrane is not targeting nor transacting business with those individuals.

Moreover, Spydercrane's "downstream" rental customers interface with a dealer and/or rental business such as Mr. Smiley, which are independently owned and operated leasing companies. Spydercrane does not control how Mr. Smiley and other dealers advertise or label their Spydercrane rentals. Indeed, the evidence at trial established that only 10% of the cranes sold by Spydercrane carry the Spydercrane label (most carry the UNIC brand), and that most dealers remove the Spydercrane label and affix their own name to the crane so as to advertise their rental business. Therefore, rental customers dealing with Mr. Smiley and similar businesses likely do not see the Spydercrane name before, during and after renting a Spydercrane crane.

Finally, even though the rental fee may be a small part of the cost of a construction project and even though forepersons and job superintendents are the renters, this does not mean that care by the end user is not exercised. To argue otherwise is to ignore essential differences in the products themselves. Construction supervisors take care with respect to the equipment and tools needed for their jobs, and are aware of the differences between mobile cranes and hoisting equipment. In other words, even construction supervisors take care with respect to rental decisions. This factor weighs in favor of Spydercrane.

    7.  Defendant's Intent in Selecting the Mark

"[I]ntent to deceive is strong evidence of a likelihood of confusion." *Entrepreneur Media*, 279 F.3d at 1148 (internal quotation marks omitted). "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id.* (internal quotation marks omitted). "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield*, 174 F.3d at 1059.

There was no evidence at trial that Mr. Wagoner and Mr. Bassetti selected the SPYDERCRANE mark in 1999 to take advantage of Spider's SPIDER marks and associated

MEMORANDUM OPINION
PAGE - 15

goodwill. Indeed, there was no evidence that either of them was even aware of Spider prior to selecting the Spydercrane name. The Court also finds Mr. Wagoner's testimony regarding the reasons for selecting the Spydercrane name -- that the cranes looked like a spider; the affiliation with sports cars; the aura of strength and industriousness; the Internet aspect and the "Join us on the web" tagline -- to be credible. While Mr. Wagoner did not perform a trademark search prior to selecting the Spydercrane name, that evidence alone, particularly in view of his and Mr. Bassetti's longtime familiarity with the cast of players in the crane industry, is insufficient to demonstrate an intent to deceive. Mr. Wagoner also eventually conducted a trademark search through Legal Zoom in 2008 which made him aware of the SPIDER marks. However, he reasonably and in good faith believed -- based on his lengthy experience in the crane business -- that the SPYDERCRANE mark did not infringe the SPIDER marks.

The Court does note that two of Spydercrane's approximately thirty-one registered Internet domain names include the word "spider" as an element of the domain name: www.spidercranesales.com and www.spidercrane.us. The Court credits Mr. Wagoner's testimony that this was done to capture misspellings and/or misperceptions about Spydercrane's name and/or domain name and not to deceive potential Spider customers. Moreover, there was no evidence at trial that these domain names have ever diverted Spider customers to Spydercrane's website. That SafeWorks' product catalog makes no mention of cranes indicates that it is unlikely that consumers seeking SafeWorks' websites (www.safeworks.com and www.spiderstaging.com) would end up being diverted to Spydercrane's website (www.spydercrane.com). Again, the relative pervasiveness of "spider" and "spyder" in the commercial world and, by extension, on the Internet, also weighs in favor of Spydercrane and against a finding of an intent to deceive. Lastly, the evidence at trial indicated that crawler and mini crawler cranes are sometimes referred to generically as "spider cranes," because of their likeness to spiders when their articulated legs are extended, which

also weighs against a finding that Spydercrane intended to deceive by registering www.spidercranesales.com and www.spidercrane.us. In view of the foregoing, the "intent to deceive" factor weighs against a finding of likelihood of confusion.

### 8. Likelihood of Expansion of Product Lines

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354; *see also M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005). The court must determine whether the allegedly infringing mark is "hindering the plaintiff's expansion plans." *Surfvivor Media v. Survivor Productions*, 406 F.3d 625, 634 (9th Cir. 2005). A plaintiff must offer proof beyond mere speculation or generalized expansion goals. *See id.* (no concrete evidence of, only expressed interest in, expansion tilted factor in favor of defendant); *Official Airline Guides v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) (the evidence of alleged intent to expand did not demonstrate that the parties would "compete with a similar product in the same market"); *Rearden*, 597 F. Supp. 2d at 1026 (one vague comment from CEO regarding expansion weighed against a finding of likelihood confusion).

Here, SafeWorks' evidence of an intent to expand is based on the trial testimony of Ms. Callahan. Ms. Callahan testified that her company is expanding its product lines, and has identified target companies to acquire and has studied under non-disclosure agreements the financials and business plans of about 30 companies. Ms. Callahan testified that some of the companies had mobile cranes in their product line. However, while SafeWorks is actively looking, it has not found any companies to acquire, nor has it established any timelines or budgets for a potential acquisition.

The Court finds that Ms. Callahan's testimony is more akin to future aspirations, and not "concrete evidence" of expansion into Spydercrane's market. In addition, there is minimal evidence that the expansion plans specifically include entry into the truck-mounted and

crawler crane market that Spydercrane occupies. The only evidence of this is Ms. Callahan's vague references that some of the companies SafeWorks has looked at have mobile cranes in their product line -- the companies and their mobile cranes were not identified despite a protective order in this action and confidentiality designations for the trial transcript. This falls short of demonstrating a "strong possibility" that the Spider division may expand to compete with Spydercrane, particularly given Ms. Callahan's testimony that while they have looked before, they have not found a suitable company to acquire. There is no evidence that Spider has identified or examined any additional companies with mobile cranes in their product lines. In view of the lack of evidence, this factor is neutral.

### 9. Conclusion Regarding the *Sleekcraft* Factors

There is no doubt that the similar sounding Spider/Spyder would be disconcerting for a company such as Plaintiff that has been in business since 1947. However, all the other *Sleekcraft* factors are either neutral or weigh against a finding of likelihood of confusion. The most important factors in this case are the amount of customer care taken, the proximity of the goods (closely related to customer care in light of the expense and specific needs for the products), and the marketing channels used. In sum, after carefully examining and weighing the eight *Sleekcraft* factors, the Court does not find that there is likelihood of confusion in the marketplace between SafeWorks' SPIDER marks and Spydercrane's SPYDERCRANE mark.

### B. Plaintiff's Federal Unfair Competition Claim

The analysis for determining trademark infringement and unfair competition under the Lanham Act is generally identical. *See Brookfield*, 174 F.3d at 1047 n.8. Federal trademark infringement claims under section 32 of the Lanham Act apply to registered marks, while unfair competition claims under section 43(a) of the Lanham Act apply to both registered and unregistered marks and protect against a wider range of practices. In both cases, the plaintiff must prove the existence of a trademark and the subsequent use by another in a manner likely to create consumer confusion. *See Comedy III Productions v. New Line Cinema*, 200 F.3d

593, 594 (9th Cir. 2000). Because SafeWorks' trademark infringement claim fails, its federal unfair competition claim also fails.

      C.    <u>Plaintiff's State Law Unfair Competition Claim</u>

Washington state courts have also adopted the "likelihood of confusion" test for statutory unfair competition claims. *eAcceleration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1114 (W.D. Wash. 2006); *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 742-43 (Wash. 1987). Therefore, the analysis of an unfair competition claim under Washington's Consumer Protection Act will generally follow that of the trademark infringement claim and will turn on the likelihood of consumer confusion regarding a protectable mark. *See Seattle Endeavors v. Mastro*, 123 Wn.2d 339, 350 (Wash. 1994). SafeWorks' state law unfair competition claim fails for the same reasons as its trademark infringement claim.

### V. CONCLUSION

For all of the foregoing reasons, the Court finds for Defendant Spydercrane on all claims. Spydercrane is awarded its costs.

DATED this 7th day of December, 2009.

*/s/ James P. Donohue*

JAMES P. DONOHUE
United States Magistrate Judge